We'll move to our second case this morning, which is Wilborn v. Ealey, Case No. 16-2106. Mr. Yavorsky, whenever you're ready. Okay. Good morning, Your Honors. May it please the Court, at the outset, I'd like to say that I'm reserving one minute for rebuttal. Repeatedly, this Court has expressed a concern over allowing a system in which law enforcement officers can use as much force as they like and escape liability under Section 1983. Affirming the case before you today would not only affirm but entrench just such a system and crater some of the most basic Section 1983 protections afforded both inmates and citizens alike as human beings. The judgment of the District Court below should be reversed and proceedings remanded for the following reasons. First, the District Court's factual findings in support of its excessive force and other claims that it disposed of at bench trial are clearly erroneous and cannot be reconciled with the evidence presented as well as with the record. Second, Mr. Wilborn was heavily prejudiced by the District Court at trial and throughout litigation by its misapplication and mishandling of the Heck Bar, its clearly erroneous credibility determinations, and its failure to recruit counsel for Mr. Wilborn. Third, the District Court erred in granting summary judgment to defendants Dunn and Hamby because Mr. Wilborn exhausted the administrative remedies available to him under Illinois law. On July 28, 2011, Joseph Wilborn was grounded and beaten by a group of over four corrections officers. He was covered in bruises, cuts, and abrasions. That was after he threw a punch, right? Don't we have to treat that as a given? No, Your Honor, you do not. And the district judge found it was true independent of the disciplinary finding? No, Your Honor, the judge did say that he found it independently, however, if you look at the reasoning for his independent finding, it refers back to the very same disciplinary proceeding. So he applies the Heck Bar and he says that I would rule on other grounds as well, but then those other grounds on multiple occasions incorporate the same principle, the Heck Principle, and the disciplinary proceeding. And in fact, he goes on, the district judge goes on to say that Mr. Wilborn was not credible because he testified contrary to the disciplinary proceeding, which basically puts him in a paralysis because he couldn't testify either way. If he testified to what he believed, that he was attacked and that he did not punch the officer, Officer Johnson specifically, then he would have been impeached by his inconsistent statement that's represented in that same proceeding. So at the disciplinary proceeding, he said that he was defending himself and that he pushed back. That is exactly what he said at trial and the district court could have found that. That would not necessarily invalidate his conviction of staff assault because the push could have sustained that conviction as well. Now the district court adopted the defendant officer's version of the facts wholesale. It found that the only force that was used against Mr. Wilborn was holding and hitting his legs, his arms and his shoulders. He was pepper sprayed and then his head was held down. These are all the specific uses of force that the district court identified. This is simply, it's not only unlikely that this is the only force they used, but it's impossible in light of uncontroverted multiple pieces of evidence that he had very serious facial injuries. His eyes were black and swollen shut. They had a cut. There was testimony that he was missing a tooth and this is all documented throughout all of his medical records that he presented at trial. So there's no way that this was, that he was simply hit in his arms and legs. The district court also found... I thought the district court found that he was trying to headbutt the officers. He was thrashing around on a hard floor, including moving his head around. Why is it impossible for a district judge to find that that's a potential source of injuries to his face and head? Well, the district court did not find specifically what caused his injuries and it was never presented that he caused his own facial injuries by thrashing his head into the ground or wherever else. I mean... Headbutts are likely to injure the head as well as the target, right? He did not headbutt at any... No. The district court found... Did I misread the district court's findings? Huh? Did I misread the district court's findings? Yes. Yes. The district court found that when he was grounded and he was face down, he attempted to headbutt Officer Ely with the back of his head. That would not have caused any damage to his eyes. There's no way that he could have... I mean, unless he was repeatedly banging his head against the ground, there's no way that he would have keep his own eyes shut. It's simply implausible. No reasonable fact finder could find that. Now, the district court also found that once Mr. Wilborn was in handcuffs, all the officers immediately seized hitting him and no further use of force... No further force was used. This is also impossible if Major Reese's testimony is accepted because Mr. Reese testified that when he saw Mr. Wilborn being transferred from North 1 to North 2, the only visible injury he had was from being pepper sprayed. Now, shortly after that, Mr. Wilborn was seen by a nurse that documented his injuries and noted more than just pepper spray injuries, noted cuts, abrasions, and then when he was seen by nurses after he was transferred to another prison, the list of injuries grew even more. Do we know how closely Major Reese examined him? Pardon me, Your Honor? Do we know how closely Major Reese examined him? Major Reese examined him enough to know that he had been pepper sprayed, meaning he got a clean look at his face, and Mr. Wilborn was handcuffed at the time, so if he had cuts on his face, Major Reese would have seen it. Was there any more... I understand the argument, but is there more specific evidence addressing that question? The only evidence is Major Reese's testimony at trial that he saw Mr. Wilborn and that he saw that he had been pepper sprayed and that those were the only visible injuries that he had at the time. Now, in addition to these inconsistencies, the fact that Mr. Wilborn... The fact that defendants claim that Mr. Wilborn was pepper sprayed at the outset of the incident is also inconsistent with the record because Mr. Wilborn had requested that he had the body because he had cuts and abrasions all over his body, and they were being irritated by the pepper spray, and this was denied. This would have also not happened, according to the defendant's version of events, because he would have had his clothes on, and defendants testified to only administering two quick short bursts of spray, which would not have been sufficient to cause those kinds of injuries that he was complaining of and that's documented in his medical records. Now, these were all clearly erroneous factual findings that warrant reversal in favor of Mr. Wilborn. Second, Mr. Wilborn was prejudiced by the district court in its mishandling of HECC, its credibility determinations, and its failure to recruit counsel. Under HECC and its progeny, Mr. Wilborn could not bring a case that would necessarily invalidate the disciplinary conviction made against him. As cases like Nelson v. Campbell pointed out subsequently, the necessary invalidation requirement is attuned to principles like harmless error, and so because here his staff assault conviction could have been sustained on the finding that he pushed Officer Johnson in self-defense, the HECC bar is not applicable here. He is not bound to the finding that Mr. Wilborn ran out and punched Officer Johnson. Well, the HECC question does turn on who started the fight, whether the officers initiated it or whether he initiated it, and they simply responded, and the disciplinary proceeding concluded that Mr. Wilborn started this altercation. Yes, I mean, the disciplinary proceeding concluded that he started the altercation, however, if that particular factual finding is invalidated, that does not invalidate the conviction. The conviction still stands if it turns out that he, in fact, just pushed Officer Johnson because that meets the requirements under Illinois regulation for staff assault. The trial judge here, though, made an alternative finding even if the HECC bar doesn't apply based on the testimony at the bench trial. The judge found that Mr. Wilborn instigated the altercation. Well, the testimony at the bench trial was tainted by the way HECC was presented and handled throughout the trial. The attorney for the defense presented the HECC objection, and the district court would not rule on it and would not explain it to Mr. Wilborn. As this court has repeatedly noted, the HECC bar can be especially confusing for pro se after the HECC objection was made, before it was ruled on or explained to him, said, okay, I'm going to fast forward, and then he skips over a major, a critical portion of his testimony, and then the district court, in assessing his testimony, faults him for having a lack of detail, when that lack of detail is directly correlated and happens right when the HECC objection came into play. Could I ask you about the counsel issue here? You've talked today about the district court having failed to recruit counsel, but in fact the district court did recruit counsel, right? And that counsel was allowed to withdraw? Yes. Do we know, what does the record tell us about the circumstances and the choices that the plaintiff faced in that? I'm sorry? What does the record tell us about why counsel sought leave to withdraw and what options were considered by the district judge and presented to the plaintiff about whether to go forward or to wait? It's my understanding that the standby counsel that was recruited withdrew shortly before trial. Yes, I know that. Because of a scheduling conflict. I'm asking you what the record shows about . . . ordinarily, look, when district judges recruit counsel, you bend over backwards to accommodate their schedules. So this is a very odd story, and I'm asking you for the background to the extent reflected in the record. I'm not aware of what options were given to Mr. Wilborn after his counsel withdrew. Perhaps defense counsel might be able to answer those questions. Did you have any comment on the assertions that hundreds of lawyers were contacted by the district court? I think it speaks to the fact that Mr. Wilborn really needed counsel for this case. This case had 10 counts when it . . . by the time . . . it had 10 counts by the time it made its summary judgment. It had over 20 at one point before it was severed. There were over 16 parties, and just . . . it was rife with complicated issues. And Mr. Wilborn made the remotions . . . That sounds to me like a non-sequitur. Okay? I was asking you about what we make of the district judge's efforts, which sound fairly extensive to find counsel. And what do we do in our judicial system if a plaintiff is going to be prejudiced by the absence of counsel, but the district court cannot find volunteers? Well, it didn't resume its efforts after the standby counsel withdrew. It just left the issue . . . Do we know anything about why that was? I'll ask defense counsel about that. Okay? Yeah. The fact that Mr. Wilborn did not have counsel at trial significantly did prejudice him. However, he was unable to navigate the difficult . . . the peck bar, as I previously mentioned. He was unable to effectively bring his case, cross-examine witnesses with his ninth grade education. He was unable to identify multiple potentially liable defendants, including officers and a nurse who he wrongfully thought was Defendant Walter, seemingly until the day of trial because it was her signature on a particular medical note that he . . . and he thought that she was the nurse that had actually seen him. It turned out that it was a different nurse and that he had no way of bringing a claim against at that point. These are issues that all could have been resolved with counsel, and therefore, he was able to bring his case. Now, third, the district court improperly granted summary judgment to Defendants Dunn and Hamby on the grounds of exhaustion of remedies. Well, my time is up, so I'll keep the remaining for my rebuttal. That's fine. You can reserve your time. Thank you. Ms. Hunger? Good morning. May it please the court. Assistant Attorney General Sarah Hunger on behalf of the state defendants at police. With the court's permission, I will speak for the first ten minutes, and then Ms. Stewart will speak on behalf of the Wexford defendants on the issue of exhaustion. I'm happy to start with the counsel issue and answer this court's questions. The record shows that after standby counsel withdrew, at the pretrial conference, the That's in Document 377. The district court had a lengthy discussion with Mr. Wilborn, where he explained that he could not guarantee that counsel would be appointed if they postponed the trial, but offered to postpone the trial so that Mr. Wilborn could move again for counsel or have more time to prepare to litigate the case himself. So he was given the opportunity to postpone the trial and to try to seek counsel again, and he declined that offer and elected to proceed on the scheduled trial date. Having done that, it is hard for him to argue now on appeal that the district court should have done more to help him after he had already contacted over 400 attorneys and recruited standby counsel. How is that done in the Southern District of Illinois? So there's actually a new program that started in early 2016, and the Southern District of Illinois has implemented a program whereby every year there's a panel of 800 attorneys, and the attorneys can be appointed during that time or recruited during that time, and then if the year goes by and they haven't been recruited, they're off the panel. So here, I imagine that the district court would have turned to that panel, and because it had been implemented by that time and requested another attorney to step in had Mr. Wilborn elected to postpone the trial. That system wasn't what was used at the beginning of the case when Judge Gilbert contacted some 400 lawyers? No, it was not because it actually was implemented through an administrative order on January 29th of 2016, which was effective March 1st, 2016. His counsel withdrew in mid-March 2016. The pretrial conference was a week before the trial that occurred in April 2016. So he would not have had the benefit of that system when he made all of these contacts, but he did so anyway. So Judge Gilbert actually contacted some 400 lawyers? That's correct. It's unclear precisely how, but there are minute orders that state, you know, for the first time I believe he contacted 65 attorneys and then 100-something and then another 100-something throughout the course of the case. And then the system was implemented right in the midst of all of this. Can you address my puzzlement about not accommodating a volunteer lawyer's schedule? Or was something else going on? The record does not bear out exactly why the court did not accommodate the volunteer lawyer's schedule. It showed that the trial had been set for a week during which the volunteer lawyer had already been scheduled to speak at a conference in Chicago, and so he could not make that work. There's simply nothing in the record showing why the district court did or did not attempt to move the trial date at that point. However, at the pretrial conference, you know, the option was given to postpone the trial to Mr. Wilborn, and I'm not sure whether then the court would have gone back to that same counsel or whether it would have sought other counsel. I would also like to talk for a moment about the HEC bar. The district court did apply the HEC bar correctly, and I would also like to point out that during the pretrial conference, again in Document 377, the district court and Wilborn and defense counsel also had a lengthy conversation about the HEC bar. The defense counsel suggested that it was going to object to certain parts of Mr. Wilborn's testimony on the basis of HEC. The district court said that it understood that objection, and Mr. Wilborn piped up and said, I don't understand that. What does that mean? Can I still put on my case? The district court answered his question and said, that just means that you can't testify contrary to what the adjustment committee decision determined. However, I will let you put on your case. Then that was reiterated again during his direct examination when he was testifying in narrative form. Defense counsel made the objection. The district court noted it and then allowed him to proceed. And so there's nothing in the record showing that that was misunderstood, especially given that there had been a lengthy discussion of that issue a week prior during the pretrial conference. Mr. Wilborn also did give his side of the story. There's nothing to show that he did not. In fact, he testified at least two times that Johnson grabbed him and choked him first, even though that was contrary to the HEC bar. He did get his side of the story out, and so there also was an independent basis for the district court to rule in addition to the HEC bar. The district court did not clearly err in that respect. I would also like to note with respect to the facial injuries, there is no evidence in the record clearly showing that the district court erred. The district court found that he suffered facial injuries, and that is consistent with its other findings. Mr. Wilborn simply has not pointed to any objective or documentary evidence on that front. I would also like to point out that the district court heard testimony and argument over a period of two days. So what do we make of the fact that Major Reese didn't see any injuries after this tussle, violent struggle that went on for several minutes, and yet after the guards got him into segregation, he's got all these identifiable injuries? Mr. Reese testified that he only saw the pepper spray injuries, and at that point, his face would have been, as you can see from the photos, swollen and red, and that's a very obvious injury. The fact that he did not see cuts or other swelling on his face is not unreasonable, and there's nothing in the record contradicting the conclusion that the injuries simply developed later or the fact that Mr. Reese just didn't see those injuries or did not remember them. I mean, this happened years before he testified at trial. It is a perfectly reasonable explanation and a conclusion that the district court reached that he did sustain these injuries during the initial altercation and that Mr. Reese only saw the injuries from the pepper spray. When it all comes down to it, Mr. Wilborn on appeal is nitpicking little decisions that the district court made. The district court heard the testimony, heard the evidence, and based upon its own estimation of that evidence and argument and testimony, it issued a careful decision that included detailed credibility determinations, dozens of findings of fact, and many well-supported conclusions of law. If the court has no further questions, we ask that it affirm the judgment of the district court. Thank you. Ms. Stewart. May it please the court, my name is Lindsay Stewart, and I represent Shelby Dunn and Lakeisha Harambee. Today we ask that this court affirm a summary judgment on behalf of these defendants as Mr. Wilborn failed to exhaust his administrative remedies. In 2011, Section 504.810 required that all grievances be submitted to the grievance officer within 60 days of the incident that gave rise to the grievance. This court has repeatedly affirmed that when an inmate fails to submit his grievance within that 60-day window, summary judgment is appropriate. In this case, the evidence adduced at the Pavey hearing reveals that the incident that gave rise to Mr. Wilborn's complaint occurred on June 28, 2011. It is undisputed that he did not submit his grievance to the grievance officer until November 6, 2011, which is 102 days after the incident that gave rise to his grievance. Accordingly, the district court properly found that it was untimely and that Mr. Wilborn failed to exhaust his administrative remedies. Did you say the incident was in June? The incident? I'm sorry. July. Okay. It's July 28th. July 28th, 2011. My apologies. What did the regulations say back in 2011 about submitting to a counselor first? The regulations required that inmates attempt to resolve disputes informally with their counselor. However, the regulations required that the grievance be written on an official grievance form and that that form be submitted to the grievance officer within 60 days if the inmate was unable to resolve the incident with the counselor through the informal resolution process. Did it establish any time limits for that informal resolution process? There was no time limit pertaining to the time for that informal resolution process, but the 60-day limit to get to the grievance officer was a firm deadline in the court. All right. So what happens if the prisoner approaches the counselor on the 59th day under that regulation? This issue was addressed at the Pavey hearing in which the Tomah branch, the grievance officer at TAMS Correctional Facility testified. And what she said is that an unwritten policy at TAMS, if they're going to take into consideration the amount of time that a grievance was with the counselor before it was submitted to the grievance officer. And this court has held that there's no requirement in Jackson v. Shepard that the inmate actually receive that written response from the counselor before going to the grievance officer, and that 60-day timeline is required. And so based on the holdings of this court, Mr. Wilburn could have gone directly to the grievance officer with his grievance. However, the testimony at the Pavey hearing was clear that the grievance officer said, as long as Mr. Wilburn submitted his grievance to the grievance officer shortly after receiving the grievance back from the counselor on October 6th, she would have considered it on the merits. What is shortly after? I don't believe that the testimony was clear on that. However, it was clear that... This sounds like, I gather the system has been clarified a good bit at this point, right? It's true that in April of this year, a new regulation went into effect that allows the inmates in 2017 to submit a grievance either to their counselor or the grievance officer. However, that procedure was not in effect in 2011. Right, but the concern that I have is that under the system that was in place, there's an awful lot of vagueness and discretion concerning timing. Yet the state or its employees or its contractors are in a position, if they wish, to insist on strict compliance with those deadlines where the other circumstances around them are vague. I think that the regulations are clear and the case law is clear on this point. I don't think that there's any... there's no legal authority. Does a prisoner have to research our opinions in order to file a grievance in a timely way? The affidavit attached to the motion for summary judgment from Ms. Johnson makes clear that all inmates are given the grievance procedures in their inmate handbook. And the grievance procedures... Not our case law, I trust. Not the case law, that's true. But they are given the grievance procedures which clearly delineate that a grievance must be submitted to the grievance officer within 60 days. I have seen no legal authority that would suggest that submitting to a... that this court has ever held that submitting a grievance to a counselor in lieu of a grievance officer is sufficient to satisfy the exhaustion principles under Section 504. No, but we have a number of cases that talk about procedures that effectively set traps for prisoners because of vagueness or contradictions and so on. Sure. What's our standard of review for the exhaustion requirement? Well, the standard of review for a grant of summary judgment certainly is de novo. However, the findings of fact and the conclusions of law... I'm sorry, the findings of fact and the credibility determinations that were made by the district court at the Pavey hearing are reviewed for clear error. So it's not really summary judgment? Correct. To the extent that Mr. Wilborn is alleging that he had good cause for the delay in filing his grievance, the determination by the district court is reviewed for an abuse of discretion. And here I would assert that the district court did not abuse its discretion in determining that there was no good cause to excuse the delay in this case. I think the evidence at the Pavey hearing was clear. The uncontroverted testimony of Toma Branch was that if she had received that grievance shortly after October 6th when it was returned to Mr. Wilborn by the counselor, she would have considered it on the merits. There is no good cause for the 30 days it took to actually get that grievance to the grievance officer. Could I just ask you, is it clear from the 2011 version of the regs that it applied to complaints about conduct of non-state employees? I believe that the 2011 regulations required all grievances about prison conditions or any of the circumstances. Including outside medical contractors. True. And just a quick point on the appointment of counsel. To the extent that Mr. Wilborn is alleging that the district court should have appointed counsel prior to the grant of summary judgment, that argument has been waived because it was not addressed in Mr. Wilborn's opening brief. And so I would ask that you affirm the grant of summary judgment to Ms. Dunn and Ms. Hamby. Thank you. Mr. Yavorsky, you have one minute. I would like to quickly point out, address summary judgment. Defendants maintain that the regulation requires a grievance form to be filed with a grievance officer within 60 days. That is not the specific language of the regulation. It states that the grievance must be filed within 60 days after discovery of the incident, problem, or occurrence. However, it does not say that filing can only be achieved by submitting it to a grievance officer and not a grievance counselor. Here, Mr. Wilborn submitted a grievance form on September 23rd, which is within 60 days of the incident, to the grievance counselor. It was stamped as received, and it was verbally addressed with a formal form. Now, the only way a defendant's interpretation of the regulation as it was enacted at the time prevails is if the preceding sentence about an informal resolution with a grievance counselor is treated as this whole drawn-out informal step, which is identical to what Mr. Wilborn and other inmates would have to go through with the grievance officer. So there's nothing informal about having to drop off your form, have it stamped as received, have it verbally addressed, or I'm sorry, addressed in writing and then returned to you, and then you have to go to the grievance officer and do the same thing over again before you appeal. That is not what the regulation stated. They have since been updated to reflect that. And under both versions, Mr. Wilborn exhausted his administrative remedies. Thank you. All right, thank you. Our thanks to both counsels. The case is taken under advisement.